UNITED STATES DISTRICT COURT MIDDLE DISTRICT OF FLORIDA

KENNETH T. MILLER,

    Plaintiff,

v.

T-MOBILE USA, INC, John Freier, Tony Berger, Jennifer Caldwell

    Defendants.

8:23-cv-1101-KKM-AEP

## COMPLAINT
## JURY TRIAL DEMAND

Plaintiff Kenneth T. Miller ("Plaintiff" or "Mr. Miller"), as and for his Complaint in this action against Defendant T-Mobile USA, John Freier, Tony Berger, Jennifer Caldwell ("Defendant" "Defendants), hereby alleges as follows:

### NATURE OF THE CLAIMS

1.     This is an action for declaratory, injunctive and equitable relief, as well as monetary damages, to redress Defendants' unlawful employment practices against Plaintiff, including its discriminatory treatment and harassment of Plaintiff due to his age, and race, and its unlawful retaliation against him after he complained about unlawful discrimination in the workplace in violation of 29 U.S.C. Section 621 et seq, the Age Discrimination in Employment Act (hereinafter "ADEA"), as amended, Section 1981 of the Civil Rights Act of 1866, 42 U.S.C. § 1981 ("Section 1981"), and the Florida Civil Rights Act, Section 760.10 F.S et seq. ("Florida Civil Right Act" or "FCRA").

1

TPA# 68567
AC

## JURISDICTION AND VENUE

2. The Court has jurisdiction over this action pursuant to 28 U.S.C. §§ 1331 and 1343 as this action involves federal questions regarding the deprivation of Plaintiff's rights under Section 1981 and the ADEA. The Court has supplemental jurisdiction over Plaintiff's related claims arising under state and local law pursuant to 28 U.S.C. § 1367(a).

3. Venue is proper in this district pursuant to 28 U.S.C. § 1391(a) because a substantial part of the events or omissions giving rise to this action, including the unlawful employment practices alleged herein, occurred in this district.

## ADMINISTRATIVE PROCEDURES

4. Prior to the filing of this Complaint, Plaintiff filed a charge of discrimination with the Equal Employment Opportunity Commission ("EEOC"), alleging violations of 29 U.S.C. Section 621 et seq, the Age Discrimination in Employment Act (hereinafter "ADEA"), as amended, and Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e et seq. ("Title VII"). Plaintiff's EEOC charge arises out of many of the same facts alleged herein that pertain to his ADEA and Section 1981 retaliation claim.

5. Upon Plaintiff's request, the EEOC has issued a notice of right to sue dated March 1, 2023.

6. Any and all other prerequisites to the filing of this suit have been met.

## PARTIES

7. Plaintiff Kenneth T. Miller (hereinafter, "Plaintiff" or "Miller") is a citizen of the United States and a resident of Hillsborough County, Florida. At all relevant times, Plaintiff is and has been a resident of the State of Florida and met the definition of an "employee" under all applicable statutes.

8. At all times relevant to this suit, Mr. Miller was employed with Defendant T-Mobile USA, Inc. and its partner, affiliate, agent Metro-by-T-Mobile formerly known as MetroPCS.

2

9. Defendant T-Mobile, USA, Inc. ("T-Mobile" or the "Company") is a foreign profit corporation incorporated under the laws of the State of Delaware, with its principal office located at 12920 SE 38th Street, Bellevue, Washington 98006. Defendant may be served with process by delivering a copy of the Summons and Complaint to its registered agent, Corporation Service Company, 1201 Hays Street, Tallahassee, Florida 32301. At all relevant times, T-Mobile USA has met the definition of an "employer" under all applicable statutes.

10. Defendant T-Mobile is engaged in interstate commerce, has an annual revenue in excess of $500,000.00, and has employed in excess of 500 employees, working for at least 20 calendar weeks in 2022 and in prior calendar years.

11. There are hundreds of T-Mobile retail stores in Florida, which the company groups into smaller geographic regions and districts.

12. Defendant T-Mobile is a covered employer within the meaning of Title VII of the Civil Rights Act, and the Age Discrimination Act.

13. Defendant John Freier (hereinafter Freier) is the President of T-Mobile's U.S. Consumer Group leading consumer-facing brands and operations for both postpaid and prepaid customer segments. Freier is responsible for teams leading consumer strategy and experience, consumer marketing, consumer operations, go-to-market planning, branded retail and customer service, and the portfolio of independently owned and operated sales and distribution channel. During all times relevant to this matter, Freier exercised substantial discretionary authority over decisions that ultimately determine corporate policy. Upon information and belief, Freier resides in the State of Washington. At all relevant times, Defendant Freier directly participated in the discriminatory and otherwise unlawful employment decisions and actions, including retaliation taken against Plaintiff and was a "covered employer" and/or an "agent," "aider," or "abettor" under all relevant statutes.

3

14. Defendant Tony Berger (hereinafter "Berger") is T-Mobile's Director of Market Sales in Florida and resides in the State of Florida. During all times relevant to this matter, Berger exercised substantial discretionary authority over decisions that ultimately determine corporate policy. At all relevant times, Defendant Berger directly participated in the discriminatory and otherwise unlawful employment decisions and actions taken against Plaintiff, including retaliation, and was a "covered employer" and/or an "aider," or "abettor" under all relevant statutes.

15. Defendant Jennifer Caldwell (hereinafter "Caldwell") is T-Mobile's Employee Success Partner and resides in the State of Florida. During all times relevant to this matter, Caldwell exercised substantial discretionary authority over decisions that ultimately determine corporate policy. At all relevant times, Defendant Caldwell directly participated in the discriminatory and otherwise unlawful employment decisions and actions, including retaliation taken against Plaintiff and was a "covered employer" and/or an "agent," "aider," or "abettor" under all relevant statutes.

16. Plaintiff does not know the true names and capacities of the defendants named herein. Plaintiff therefore sues those defendants by the names used by them during his acquaintance. Plaintiff will amend this complaint to allege their true names and capacities when ascertained. Plaintiff is informed and believes and thereon alleges that each of the named defendants is responsible in some manner for the occurrences herein alleged and plaintiff's damages as herein alleges were proximately caused by those defendants. On information and belief, plaintiff makes all allegations contained in this complaint against all defendants.

17. Plaintiff is informed and believes and thereon alleges that at all times herein mentioned, the defendants, and each of them, were the agents, servants, and/or employees of each and every other defendant, and that all acts and omissions herein complained of were performed within the course and scope of said employment, service, or agency.

4

## FACTUAL ALLEGATIONS

Plaintiff hereby pleads and incorporates by reference all of the allegations contained in Paragraphs 1 through 17, as if the same were set forth herein.

18. Plaintiff Kenneth T. Miller (Plaintiff or Mr. Miller) is a white male over the age of 40 and a former employee of "the new" T-Mobile.

19. Mr. Miller was bullied, harassed, and discriminated against by his supervisors and agents of T-Mobile and was targeted for termination due to his race and age.

20. When Mr. Miller complained about the bullying, harassment and discrimination based on his age and race, T-Mobile terminated him in retaliation for his complaint.

21. Mr. Miller was employed for T-Mobile and its predecessor, MetroPCS from July 5, 2005, until his termination on June 16, 2022.

22. MetroPCS hired Mr. Miller in 2005 for the position of Account Manager. While in this position Mr. Miller developed a detailed project plan for effective real estate site selection of locations throughout the Tampa Bay Region, including conducting a Pasco County real estate analysis as a growth opportunity for the company. He also established third party partners through effective screening processes to build a successful network of resellers in the Tampa Bay region. Mr. Miller:

- Supervised real estate site selection for high traffic and profitable commercial locations.
- Assisted partners with lease negotiations and permitting.
- Was responsible for recruiting and developing profitable third-party channel resellers.
- Hired, trained and developed a team of nine Account Service Representatives.
- And produced an average sales growth of 24% year over year due to his successful market analysis.

23. Mr. Miller's position was reclassified in 2009 into the position of Manager of Indirect Accounts for the central Florida region. In this position he led a team of managers to accomplish sales results and to overachieve on monthly Key Performance Indicators. He established and met

5

baseline goals over and above corporate targets to beat expectations and for his team to become number one in the country. In this capacity, Mr. Miller:

- Developed sales budgets and drive results monthly averaging $450,000 in monthly retail sales.
- Was responsible for a marketing budget averaging over $30,000 per quarter to support local business development campaigns.
- Evaluated results monthly with sales teams and business partners, recommending and coaching on operational and sales improvements.
- Worked with channel partners on operational efficiency and employee training programs.
- Interpreted applicable FCC and corporate rules and codes to ensure compliance.
- Developed training presentations and conduct group training sessions with third party employees.
- Prepare and present quarterly data results to owners and Corporate managers in graphic and written form.
- Initiate HR screening program to assist indirect partners with finding quality employees.
- Respond to elevated customer inquiries and resolve complaints.

24. On or about March 12, 2013, the FCC approved a merger and acquisition between T-Mobile and MetroPCS as follows:

> Deutsche Telekom AG, the ultimate parent company of T-Mobile USA, Inc., and MetroPCS Communications, Inc. have filed applications seeking Commission approval for the transfer of control to Deutsche Telekom of the licenses, leases and authorizations held MetroPCS and its subsidiaries. In the underlying transaction, T-Mobile USA and MetroPCS will be combined, with Deutsche Telekom holding 74% of the combined company and MetroPCS's shareholders the remaining 26%. T-Mobile USA is the fourth largest national wireless carrier in the United States, while MetroPCS offers wireless services in nineteen major metropolitan areas in the United States on a predominantly flat-rate, no long-term contract basis. Deutsche Telekom is a German company, with the Federal Republic of Germany holding a direct interest of approximately 15 percent and, along with the German federal states, an approximately 17% indirect interest.

25. In February 2014, Mr. Miller was qualified for and became a Zone Manager, Metro Sales for T-Mobile, reporting to Kimberly Watson, Director Market Sales. As a Zone Manager, Mr. Miller was expected to lead a team to provide sales and support for Indirect Distribution in a local market. The team was responsible for establishing and maintaining effective relationships with dealer employee representatives and dealer principals. They were responsible for the proper operation of the stores to include dealer compliance with all company policies and

6

procedures. In this position Mr. Miller coached a team to exceed goals and create plans for future success. He researched and analyzed demographic and psychographic information to offer alternatives for business locations. Mr. Miller was:

- Responsible for $5.4 million in annual revenue utilizing marketing data to guide team direction.
- Number one Zone Manager in country multiple months in 2021 and 2022.
- Grew three territories into national top five status in 2020, 2021 and beginning of 2022.
- Worked closely with Marketing team to create effective plans for proper store placement.
- Interpreted applicable FCC and corporate rules and codes to ensure compliance.
- Prepared and presented quarterly data results to owners and Corporate managers in graphic and written form.
- Developed detailed project plans to enhance results to meet quarterly projections.
- Created regional initiatives to drive KPI growth; one initiative increased monthly customer service scores by 5%.
- Developed and managed recognition programs to enhance customer satisfaction; and
- Responded to elevated customer inquiries and resolved complaints.

26. Upon information and belief, T-Mobile assured the FCC and the public that the merger and acquisition would not result in loss of employment for Sprint or Metro employees. Through its executive, John Legere, T-Mobile is quoted as stating,

> The same haters said…the Metro acquisition would lead to "significant" job losses and likely produce lower quality service (hmmmm… I've heard this somewhere before recently) …Yet we delivered more jobs with better benefits than ever! We created thousands of new jobs supporting Metro by doubling Metro's customer base and expanding to serve new markets. The same group that is predicting job losses at the New T- Mobile– predicted we would eliminate up to 10,000 jobs in the MetroPCS acquisition. How did that prediction fare? Since 2013, we added tens of thousands of new jobs, including Metro and Metro dealer employees who support the Metro brand. We brought Metro employees into the family with great pay and benefits, including many of which they may not have had before – from medical, dental and vision to childcare subsidies, paid parental leave, stock grants and tuition coverage….we WILL deliver on ALL of our promises. You can count on that."

27. On or about October 2018, John Legere, as a T-Mobile top executive, spoke at a Sprint companywide town hall meeting and re-assured employees that jobs would be protected stating,

> "We've said it from day one: There will be more jobs on day one and every day thereafter than both companies. And by the way, that's assuming that both companies are successful with the plans that they had laid out. Right? So it could be even more than what would ultimately happen."

7

28. On or about November 2019, John Legere announced the onset of the transition from Metro to Metro by T-Mobile.

29. Mr. Miller was a long-term and dedicated employee. Between his date of hire in July 2005 and his last date of employment, Mr. Miller received numerous recognition awards for his performance, including:

- Generating $5.4 million in annual revenue utilizing marketing data to guide team direction.
- Gaining recognition as the #1 Zone Manager in country multiple months in 2021 and 2022.
- Growing three territories into national top five status in 2020, 2021 and beginning of 2022.

30. In addition, under his leadership, subordinate members of his team also received prestigious recognition awards for their performance.

31. Beginning on or about March 9, 2020, the State of Florida issued a series of Emergency Orders imposing restrictions on business and travel, among other issues, in response to the COVID pandemic. These restrictions were also mandated by the White House and Centers for Disease Control. The restrictions imposed significantly affected the operations of T-Mobile and its employees, including and in particular Zone Managers such as Mr. Miller.

32. On or about April 2020, T-Mobile merged with Sprint. The Sprint brand was discontinued by T-Mobile on or around August 2, 2020.

33. On or about August 2020, T-Mobile began a reduction in force and re-organization.

34. T-Mobile did not announce the criteria utilized to determine which employees would be eliminated.

35. The reduction in force and transition undertaken by T-Mobile established a pattern which demonstrates its intention to eliminate older employees.

36. Upon information and belief, T-Mobile undertook the reduction in force and transition with an intention to eliminate older employees.

8

37. Beginning on or about August 2020, T-Mobile effected a series of layoffs of senior Metro staff including Mr. Miller's supervisor, Ms. Watson.

38. Between his date of hire in July 2005 and Ms. Watson's departure in August 2020, Mr. Miller was considered an exemplary employee, receiving positive performance evaluations and reviews in addition to the sales recognition awards cited above.

39. After Ms. Watson's departure, Mr. Miller reported to Tony Berger, who replaced Ms. Watson as Director of Market Sales. At the time Mr. Berger became his supervisor, Mr. Miller was one of the oldest Zone Managers under Berger's direction.

40. On or around March 2022, T-Mobile CEO Mike Sievert announced senior leadership changes and re-organization actions at his level. From this date forward, T-Mobile began to accelerate the number of layoffs and "buy-out packages" directed at employees acquired as part of the merger with Metro, especially older employees.

41. Mr. Miller's last date of employment was June 16, 2022.

42. Upon information and belief, Tony Berger made compensation recommendations and decisions on the basis of age and race.

43. Upon information and belief, Tony Berger made recommendations and determined which staff would be eliminated on the basis of their age and race.

44. Beginning on or about August 2020 to on or about January 2021, Mr. Miller worked closely with Berger to get him acquainted with the territory and introduce Berger to all key individuals associated with the company from its days as MetroPCS.

45. Beginning on or about January 2021, Berger began to harass Mr. Miller making such statements as "Ken is out of touch." and, laughing at him in front of subordinates, including making such statements as, "Ken likes to read books. Nobody reads books anymore Ken! Books are old and passe."

46. Beginning on or about January 2021, Berger also began to hold Mr. Miller to different

9

standards than other Zone Managers who were younger or of a different race, ultimately issuing an inaccurate, and inappropriate Not In Good Standing (NIGS) determination accusing him of violating the company's Code of Conduct because Mr. Miller disagreed with Berger during a telephone conversation on January 8, 2021; had held a critical conversation about apparently fraudulent activities with an authorized dealer; and because one of Mr. Miller's subordinates felt "insulted" when at Berger's direction, Mr. Miller questioned why the subordinate did not want to pursue any development goals . This NIGS was in effect from February 4, 2021, to May 4, 2021.

47.     After May 4, 2021, Mr. Miller successfully responded to the NIGS and was returned to Good Standing. Nonetheless, Berger continued to discriminate against Mr. Miller by harassing and bullying him about every minute detail, treating him differently and holding him to a different standard than other Zone Managers who were younger or of a different race.

48.     Upon information and belief, Berger with a willful and conscious disregard of Mr. Miller's rights, enlisted the assistance of and directed Sam Baez, a younger, African American subordinate of Mr. Miller's to investigate Mr. Miller's performance and conduct.

49.     Upon information and belief, Defendant Berger directed Sam Baez to report on Mr. Miller's actions and activities while managing Baez and performing store visits with Baez. Mr. Miller was never provided with any negative reports resulting from Baez' spying on Mr. Miller.

50.     On or about February 2022 merit raises for 2021 were distributed. Mr. Miller received a 0% increase, which was lower than other, younger Zone Managers.

51.     Upon information and belief, Berger and Caldwell changed the compensation policy to add language which would exclude any employee who had received a NIGS during the previous year, even when the employee had successfully completed the NIGS. Upon information and belief, Mr. Miller was the only employee in his market who was excluded from receiving a pay increase.

52.     T-Mobile provided Mr. Miller with training on the documentation necessary to make job performance recommendations. This training included instruction on what was necessary to make

10

recommendations on promotions and salary raises.

53. Based on this training, Mr. Miller made recommendations to Berger regarding compensation increases for his team of subordinates. His recommendations were accepted for all team members except for Sam Baez.

54. Upon information and belief, Berger exercised his discretion to reward Sam Baez for his participation in spying on Mr. Miller, with a 5% pay raise which was higher than the increase received by any other employee on Miller's team.

55. Plaintiff Miller survived layoffs but continued to be subjected to Berger's discrimination, harassment, and bullying.

56. Mr. Miller followed the steps dictated by the Employee Handbook and T-Mobile policy of reporting discrimination to address his concerns that he was being harassed and discriminated against on the basis of his age and race. The paragraphs below provide timeline of his efforts to communicate his concerns of discrimination due to his age and race to his manager, his manager's HR partner, and higher-level management within the chain of command:

57. On or about August 23, 2021, through his previous counsel, Mr. Miller provided Notice to T Mobile attorney Chris Luna of ongoing discrimination stating specifically that, "Senior and older legacy employees such as himself have been unjustly targeted for job elimination."

58. Almost immediately thereafter, on or around August 27, 2021, Berger issued a second "Not In Good Standing" report to Plaintiff Miller which was again filled with inaccurate and inappropriate statements. The second NIGS determination was in effect from August 27, 2021, to November 24, 2021.

59. On or around August 30, 2021, Mr. Miller provided a response to Berger regarding NIGS, showing that he had been discriminated against. (See Attachment)

60. On or around November 30, 2021, Mr. Miller successfully responded to the "Not In Good Standing" report and was returned to Good Standing. Nonetheless, Berger's bullying, harassment

11

and discrimination continued.

61. In accordance with the T-Mobile discrimination complaint procedure, on or about February 14, 2022, Mr. Miller requested a "skip level" meeting with Berger's supervisor, Megan Panicucci.

62. On or about February 2022, Mr. Miller met with an employee from the Employee Relations Department named Elisa to let her know that he was feeling discriminated against. During this meeting, Mr. Miller also informed Elisa that the HR Partner assigned to assist his Zone, Defendant Caldwell was not helpful and instead was protecting Berger's discriminatory conduct.

63. On or about February 2022, Mr. Miller sent a follow up email to Elisa in Employee Relations restating his belief that he was being discriminated against.

64. On or about March 7, 2022, Mr. Miller met with Berger's supervisor Megan Panicucci to let her know that he believed he was being discriminated against. During this meeting, Mr. Miller also informed Panicucci that the HR Partner assigned to assist his Zone, Defendant Caldwell was not helpful and instead was protecting Berger's discriminatory conduct.

65. On or about March 29, 2022, Mr. Miller spoke with Senior Vice President of Prepaid Markets Terry Hayes who is the next level in the chain of command, letting him know that he believed he was being discriminated against. During this meeting, Mr. Miller also informed Hayes that the HR Partner assigned to assist his Zone, Defendant Caldwell was not helpful and instead was protecting Berger's discriminatory conduct.

66. On or about April 12, 2022, Mr. Miller spoke with President of Consumer Sales, Jon Frier, who is the top of the chain of command, letting him know that he felt discriminated against. During this meeting, Mr. Miller also informed Frier that the HR Partner assigned to assist his Zone, Defendant Caldwell was not helpful and instead was protecting Berger's discriminatory conduct.

67. On or about May 19, 2022, Mr. Miller met with the VP of Retail Sales Annie Garcia, who was Berger's new supervisor, to let her know that he was feeling discriminated against. During

this meeting, Mr. Miller also informed Garcia that the HR Partner assigned to assist his Zone, Defendant Caldwell was not helpful and instead was protecting Berger's discriminatory conduct.

68. Laura Smith, Sr. Manager, HR Partner-Prepaid East Region, was on every one of these calls, except Mr. Miller's call with Employee Relations, and heard him say multiple times that he felt like he was being discriminated against. During these meetings, Laura Smith heard that the HR Partner assigned to assist his Zone, Defendant Caldwell was not helpful and instead was protecting Berger's discriminatory conduct.

69. On information and belief Caldwell took a leave of absence from T-Mobile, from on or about February 2022, to May 2022.

70. Upon Caldwell's return, on or about June 7, 2022, Mr. Miller was informed by Calwell that Sam Baez (the African American male employee who was being directed by Berger to spy on Mr. Miller) had allegedly reported that Mr. Miller was discriminating against him on the basis of his race by documenting Baez's performance deficiencies and had excluded him from an informal meeting, due to his race.

71. Mr. Miller was requested to attend a meeting with Baez by Defendant Caldwell to respond to Baez' concerns.

72. On or about June 10, 2022, Mr. Miller provided Caldwell with documentation to show that he had followed the correct protocol in documenting Baez's performance deficiencies, including the dates and times he had conversations with Baez in order to hold Baez accountable for his actions. This response also addressed the questions about the informal meeting.

73. On or about June 10, 2022, immediately following Mr. Miller's email to Caldwell showing documentation of Baez' performance deficiencies and responding to questions relating to the informal meeting, Caldwell cancelled the meeting.

74. Despite the lack of documentation that Mr. Miller had inaccurately documented Baez performance deficiencies, or that Baez had been excluded from a meeting, on or about June 15,

13

2022, Caldwell contacted Mr. Miller to conduct a telephone interview him about Baez' allegations.

75. During this interview, Mr. Miller indicated to Caldwell that he did not wish to proceed with the interview alone because he did not trust her as an HR Partner. Caldwell ignored Mr. Miller's request and continued the conversation against his will.

76. During the interview, Mr. Miller stated his disagreement with the allegations that his supervisory actions toward Baez were racially motivated.

77. During the interview, Mr. Miller stated to Caldwell that he treated his subordinates with respect as required by the Employee Code of Conduct.

78. In response to Mr. Miller's disagreement with Caldwell's questions during the interview, Caldwell demanded that she be treated with "respect."

79. On or about June 15, 2022, in retaliation for the reports to her supervisors that Mr. Miller had made about her support of Berger's discriminatory conduct, Caldwell reported to Laura Smith that Mr. Miller had treated her with disrespect and accused him of violating the company's Code of Conduct. Caldwell did not state that Mr. Miller disrespected her due to race, age or sex, nor did she allege that Mr. Miller threatened her in any manner, she merely stated that she did not like the way he spoke to her – a vague statement not supported by the Code of Conduct.

80. Without any investigation regarding Caldwell's allegations, on June 16, 2022, Mr. Miller was terminated citing Caldwell's retaliatory report.

## FIRST CAUSE OF ACTION
### (Discrimination in Violation of Section 1981 and the ADEA)

Plaintiff hereby repeats and realleges the allegations in each of the preceding paragraphs as if fully set forth herein.

81. Defendants have violated Section 1981 and the ADEA by subjecting Plaintiff to discrimination on the basis of race and age, by, *inter alia,* terminating Plaintiff's employment with the Company.

14

82. As a direct and proximate result of Defendants' unlawful discriminatory conduct in violation of Section 1981 and the ADEA, Plaintiff has suffered and continues to suffer monetary and/or economic damages, including, but not limited to, loss of past and future income, compensation and benefits for which he is entitled to an award of monetary damages and other relief.

83. As a direct and proximate result of Defendants' unlawful discriminatory conduct in violation of Section 1981 and the ADEA, Plaintiff has suffered and continues to suffer severe mental anguish and emotional distress, including, but not limited to, depression, humiliation, embarrassment, stress and anxiety, loss of self-esteem and self-confidence, and emotional pain and suffering for which he is entitled to an award of monetary damages and other relief.

84. Defendants' unlawful discriminatory conduct constitutes a willful and wanton violation of Section 1981 and ADEA, was outrageous and malicious, was intended to injure Plaintiff, and was done with conscious disregard of Plaintiff's civil rights, entitling Plaintiff to an award of punitive damages.

### (Retaliation in Violation of Section 1981 and the ADEA)

Plaintiff hereby repeats and realleges the allegations in each of the preceding paragraphs as if fully set forth herein.

85. Defendants have violated Section 1981 and the ADEA by subjecting Plaintiff to retaliation for his protected complaints and opposition to Berger and Caldwell's discriminatory comments and actions on the basis of race and age, by, *inter alia,* terminating Plaintiff's employment with the Company.

86. As a direct and proximate result of Defendants' unlawful retaliatory conduct in violation of Section 1981 and the ADEA, Plaintiff has suffered and continues to suffer monetary and/or economic damages, including, but not limited to, loss of past and future income, compensation and

15

benefits for which he is entitled to an award of monetary damages and other relief.

87. As a direct and proximate result of Defendants' unlawful retaliatory conduct in violation of Section 1981 and the ADEA, Plaintiff has suffered and continues to suffer severe mental anguish and emotional distress, including, but not limited to, depression, humiliation, embarrassment, stress and anxiety, loss of self-esteem and self-confidence, and emotional pain and suffering for which he is entitled to an award of monetary damages and other relief.

88. Defendants' unlawful retaliatory conduct constitutes a willful and wanton violation of Section 1981 and the ADEA, was outrageous and malicious, was intended to injure Plaintiff, and was done with conscious disregard of Plaintiff's civil rights, entitling Plaintiff to an award of punitive damages.

## SECOND CAUSE OF ACTION

### (Violation of the Florida Civil Rights Act Against Discrimination)

Plaintiff hereby repeats and realleges the allegations in each of the preceding paragraphs as if fully set forth herein.

89. Defendants have discriminated against Plaintiff in violation of the Florida Civil Rights Act Against Discrimination by subjecting him to disparate treatment because of his race and age, by, *inter alia,* terminating Plaintiff's employment with the Company.

90. As a direct and proximate result of the Defendants' unlawful discriminatory conduct in violation of the Florida Civil Rights Act Against Discrimination, Plaintiff has suffered and continues to suffer financial and economic damages as well as severe mental anguish and emotional distress, including but not limited to, depression, humiliation, embarrassment, stress and anxiety, loss of self-esteem and self-confidence, and emotional pain and suffering.

91. Defendants' unlawful discriminatory conduct constitutes a willful and wanton violation of the Florida Civil Rights Act Against Discrimination, was outrageous and malicious, was intended

to injure Plaintiff and was done with reckless indifference to Plaintiff's civil rights, entitling Plaintiff to an award of punitive damages.

### THIRD CAUSE OF ACTION

### (Retaliation in Violation of the Florida Civil Rights Act Against Discrimination)

Plaintiff hereby repeats and realleges the allegations in each of the preceding paragraphs as if fully set forth herein.

92. Defendants have violated the Florida Civil Rights Act Against Discrimination by subjecting Plaintiff to retaliation for his protected complaints and opposition to Berger and Caldwell's discriminatory comments and actions on the basis of age and race by, *inter alia*, terminating Plaintiff's employment with the Company.

93. As a direct and proximate result of Defendants' unlawful retaliatory conduct in violation of the Florida Civil Rights Act Against Discrimination, Plaintiff has suffered and continues to suffer monetary and/or economic damages as well as suffer severe mental anguish and emotional distress, including but not limited to, depression, humiliation, embarrassment, stress and anxiety, loss of self-esteem and self-confidence, and emotional pain and suffering.

94. Defendant's unlawful retaliatory conduct constitutes a willful and wanton violation of the Florida Civil Rights Act Against Discrimination, was outrageous and malicious, was intended to injure Plaintiff, and was done with reckless indifference to Plaintiff's civil rights, entitling Plaintiff to an award of punitive damages.

### PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays that the Court enter judgment in his favor and against Defendants, containing the following relief:

A. A declaratory judgment that the actions, conduct and practices of Defendants complained of herein violate the laws of the United States and the State of Florida;

17

B.   An injunction and order permanently restraining Defendants from engaging in such unlawful conduct;

C.   An order directing Defendants to place Plaintiff in the position he would have occupied but for Defendants' discriminatory, retaliatory and/or otherwise unlawful treatment of his, as well as to take such affirmative action as is necessary to ensure that the effects of these unlawful employment practices and other unlawful conduct are eliminated and do not continue to affect Plaintiff;

D.   An award of damages in an amount to be determined at trial, plus prejudgment interest, to compensate Plaintiff for all monetary and/or economic damages, including, but not limited to, the loss of past and future income, wages, compensation, job security and other benefits of employment;

E.   An award of damages in an amount to be determined at trial, plus prejudgment interest, to compensate Plaintiff for all non-monetary and/or compensatory damages, including, but not limited to, compensation for his severe mental anguish and emotional distress, humiliation, depression, embarrassment, stress and anxiety, loss of self-esteem, self-confidence and personal dignity, and emotional pain and suffering and any other physical or mental injuries;

F.   An award of damages in an amount to be determined at trial, plus prejudgment interest, to compensate Plaintiff for harm to his professional and personal reputation and loss of career fulfillment;

G.   An award of damages for any and all other monetary and/or non-monetary losses suffered by Plaintiff in an amount to be determined at trial, plus prejudgment interest;

H.   An award of punitive damages;

I.   An award of costs that Plaintiff has incurred in this action, as well as Plaintiff's reasonable attorneys' fees to the fullest extent permitted by law; and

J.   Such other and further relief as the Court may deem just and proper.

## JURY DEMAND

Plaintiff hereby demands a trial by jury on all issues of fact and damages stated herein.

Dated: 5/19/2023

By: _____
KENNETH T. MILLER, PLAINTIFF
6104 DORY WAY
TAMPA, FLORIDA 33615
Email: kentodd63@gmail.com
Telephone: (813)401-4444